# EXHIBIT A

STATE OF NEW YORK
SUPREME COURT  :  COUNTY OF ALBANY

_____

DEBRA HILL, BRITTANY MCNAIR, DAVID
OLIVENCIA, AUDREYANNA GALLARDO,
JENNIFER MALINOWSKI, CHELSEA
STURTEVANT, ED SOKOL, CHRISTOPHER
SEVINSKY, MARGARET FRANKLIN,
AND OTHERS SIMILARLY SITUATED,

                    Plaintiffs,

                                                                                Index No.:

          -vs-

NORLITE, LLC, TRADEBE ENVIRONMENTAL
SERVICES, LLC, AND TRADEBE TREATMENT
AND RECYCLING NORTHEAST, LLC,

                    Defendants.

_____

## **SUMMONS**

TO DEFENDANTS:

          **YOU HEREBY ARE SUMMONED** to appear in this action by serving your
Answer to the Complaint on Plaintiffs' attorneys within the time limits stated below.

          Albany County is designated as the county where this action will be tried because
this action Defendants have offices for the conducting of business and/or principal places of
business in that county and the events giving rise to the cause of action occurred in that county.

          **TIME LIMITS TO ANSWER:**

(1)     If this summons is served by delivery to you personally within New York
          State, you must answer the Complaint within TWENTY (20) days after
          such delivery.

(2)     If this summons is not served by delivery to you personally within New
          York State, and not served pursuant to CPLR 312-a, you must answer the
          Complaint within THIRTY (30) days after service is complete.

(3)     If this Summons is served pursuant to CPLR 312-a, see accompanying
          STATEMENT OF SERVICE BY MAIL for time limits to answer.

**IF YOU FAIL TO ANSWER THE COMPLAINT** within the time stated, judgment will be entered against you for the relief demanded in the Complaint.

Dated: March 11, 2021
       Saratoga Springs, New York

                                   **RUPP BAASE PFALZGRAF CUNNINGHAM, LLC**
                                   *Attorneys for Plaintiffs*

                                   _____
                                   Phillip A. Oswald, Esq.
                                   25 Walton Street
                                   Saratoga Springs, NY 12866
                                   Tel: (518) 886-1902
                                   oswald@ruppbaase.com

TO:    **NORLITE, LLC**
       628 South Saratoga Street
       Cohoes, NY 12047

       **TRADEBE ENVIRONMENTAL SERVICES, LLC**
       234 Hobart Street
       Meriden, CT 06450

       **TRADEBE TREATMENT AND RECYCLING NORTHEAST, LLC**
       234 Hobart Street
       Meriden, CT 06450

-2-

STATE OF NEW YORK
SUPREME COURT  :  COUNTY OF ALBANY

---

DEBRA HILL, BRITTANY MCNAIR, DAVID
OLIVENCIA, AUDREYANNA GALLARDO,
JENNIFER MALINOWSKI, CHELSEA
STURTEVANT, ED SOKOL, CHRISTOPHER
SEVINSKY, MARGARET FRANKLIN,
AND OTHERS SIMILARLY SITUATED,

                         Plaintiffs,

      -vs-

NORLITE, LLC, TRADEBE ENVIRONMENTAL
SERVICES, LLC, AND TRADEBE TREATMENT
AND RECYCLING NORTHEAST, LLC,

                 Defendants.

**Class Action Complaint**
Index No.:

---

The above-named Plaintiffs, on behalf of themselves and all those similarly

situated, by and through their attorneys, Rupp Baase Pfalzgraf Cunningham, LLC, as and for

their Class Action Complaint against Defendants, allege as follows:

## **PARTIES**

1.     At all times relevant to this action, Plaintiff, Debra Hill, is a resident of

Albany County who currently resides at and has resided at the Saratoga Sites apartment buildings

("Saratoga Sites") in Cohoes, New York.  Ms. Hill has resided at Saratoga Sites for

approximately 11 years.

-1-

2.      At all times relevant to this action, Plaintiff, Brittany Mcnair, is a resident of Albany County who currently resides at and has resided at Saratoga Sites for approximately four years.

3.      At all times relevant to this action, Plaintiff, David Olivencia, is a resident of Albany County who resided at Saratoga Sites for approximately 14 years.

4.      At all times relevant to this action, Plaintiff, Audreyanna Gallardo, is a resident of Albany County who resided at Saratoga Sites for approximately 12 years.

5.      At all times relevant to this action, Plaintiff, Jennifer Malinowski, is a resident of Albany County and currently resides at and has resided at Saratoga Sites for approximately six years.

6.      At all times relevant to this action, Plaintiff, Chelsea Sturtevant, is a resident of Albany County who currently resides at and has resided at Saratoga Sites for approximately three years.

7.      At all times relevant to this action, Plaintiff, Ed Sokol, is a resident of Albany County who owns property in Cohoes, New York where he currently resides and has resided at for approximately 58 years.

-2-

8.  At all times relevant to this action, Plaintiff, Christopher Sevinsky, is a resident of Albany County who owns property in Watervliet, New York where he currently resides and has resided at for approximately 5 years.

9.  At all times relevant to this action, Plaintiff, Margaret Franklin, is a resident of Albany County who owns property in Green Island, New York where she currently resides and has resided at for approximately four years.

10.  At all times relevant to this action, Defendant, Norlite, LLC ("Norlite"), is and has been a Delaware company registered to do business in New York State, with its principal office and/or place of business located at 628 South Saratoga Street, City of Cohoes, State of New York.  Upon information and belief, Norlite's only place of business is and the entirety of its operations occur at 628 South Saratoga Street in Cohoes, New York.

11.  Upon information and belief, at all times relevant to this action, Defendants, Tradebe Environmental Services, LLC and Tradebe Treatment and Recycling Northeast, LLC (collectively, "Tradebe"), are and have been Delaware companies registered to do business in New York State, with principal offices and/or places of businesses located at 1433 East 83rd Ave, Suite 200, City of Merrillville, State of Indiana and/or 234 Hobart Street, City of Meriden, State of Connecticut.  Tradebe is in the business of waste collection, transportation, management, and disposal.

-3-

## JURISDICTION AND VENUE

12.     Under Article 3 of the N.Y. CPLR, this Court has jurisdiction over this action and the parties because Defendants conduct business in the State, this action involves injunctive relief, and this action involves a monetary amount that exceeds the jurisdictional limits of lower courts.

13.     Under N.Y. CPLR §§ 503 and 507, venue in Albany County is proper because Defendants have offices for the conducting of business and conduct business in that county and the events giving rise to the cause of action occurred in that county.

## FACTUAL BACKGROUND

14.     Through this action, Plaintiffs and the class members seek monetary and injunctive relief as damages for and to address various harms and injuries resulting from repeated and continuing fugitive dust emissions caused by Defendants' processing, handling, and/or storage of aggregate materials, fines materials, and block-mix materials (materials, particulates, and/or substances emitted from these materials will be collectively referred to as "fugitive dust emissions"). Fugitive dust emissions, as that phrase is used herein, do not include emissions arising solely from the ignition and/or incineration of hazardous wastes or other fuels burned by Defendants.

-4-

Case 1:21-cv-00439-ECC-DJS   Document 2   Filed 04/16/21   Page 8 of 50

A. **General Background.**

15.     Defendants own and operate an aggregate production and hazardous waste incineration facility that has an address of 628 South Saratoga Street, City of Cohoes, State of New York (the "Norlite Facility").

16.     The Norlite Facility is an approximate 221-acre site that is located in Albany County, with approximately 40 acres of the site being located within the boundaries of the City of Cohoes and the remaining being located in the Town of Colonie.  Residential communities surround the Norlite Facility.

17.     The eastern boundary of the Norlite Facility is a railroad track that also immediately adjoins Saratoga Sites, which consists of several residential apartment buildings that are owned and operated by the Cohoes Housing Authority.  The property borders for the Norlite Facility and Saratoga Sites are less than 200 feet apart.

18.     Many residents at Saratoga Sites receive rental assistance through federal and state funded programs, as Saratoga Sites is one of the few locations in the area that participate in those programs.  Give the lack of availability of other residential apartments that participate and/or are eligible for those programs and the high demand at other residential apartments that do participate in and are eligible for those programs, many residents at Saratoga Sites, including Plaintiffs and the class members, do not have the ability to freely relocate.

-5-

19.     Based on the 2010 U.S. Census and the 2006-2010 American Community Survey 5-Year Summary, the Norlite Facility is known to be located in a geographical area where, at the time, approximately 5,592 people live within a one-mile radius, including approximately 1,308 minors.  There are approximately 2,770 housing units in this area. Approximately 1,819 — or approximately 32.5% — of the residents in this area were classified as being below the poverty level, and approximately 58.42% of the households have a recorded income of below $50,000.

20.     Based on the 2000 Census, the DEC has designated the area and communities surrounding the Norlite Facility as an Environmental Justice area, meaning that these communities are minority and low-income communities that are likely to "bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies."

21.     Upon information and belief, the Norlite Facility was acquired by Tradebe on or around April 15, 2011

22.     Norlite and staff employed for the same primarily oversee and carry out the day-to-day operations at the Norlite Facility, but, upon information and belief, staff and/or representatives employed by Tradebe are regularly present at the Norlite Facility and/or regularly partake in overseeing and carrying out the day-to-day operations at the Norlite Facility.

-6-

23. Tradebe has an active role in the processes and procedures at the Norlite Facility, including actively assuming the responsibility and duty to control fugitive dust emissions from the Facility. For example, fugitive dust analyses and control plans — both being grossly insufficient and flawed and, in any event, were not followed — were developed, overseen, and submitted by Tradebe. Also, representatives from Tradebe have often been the main point of contact and liaison in these matters for the DEC and concerned citizens from the communities surrounding the Norlite Facility.

24. More specifically and as particularly relevant here, one document that Tradebe had an active role in preparing was the Fugitive Dust Plan (the "FDP"). That plan identifies the Norlite facility as the "Tradebe Environmental Services, LLC (Tradebe) Norlite facility." Furthermore, upon information and belief, Tradebe played an active role in preparing that plan, communicating with the DEC regarding it, and administering it.

25. At all times relevant, Defendants are able to control and have the duty to control and oversee the various processes and operations discussed below.

B. **Operations at the Norlite Facility.**

26. Among the materials that Defendants produce at the Norlite Facility are the following: block mix (approximately 92,000 tons per year ("tpy")), 3/4" aggregate (approximately 69,000 tpy), 3/8" aggregate (approximately 46,000 tpy), and aggregate fines (approximately 28,000 tpy).

-7-

27.    Defendants produce and sell these materials for use in various construction markets, including structural concrete, masonry, geotechnical fill, bridges, horticulture, internal curing, asphalt, and others.

28.    Defendants produce these materials by mining shale on site at a quarry and then transporting the materials to an area known as the "Processing Area" or "Plant Area" using dirt-moving equipment and dump trucks.  Various processing, handling, and/or storage activities occur in several smaller areas within the "Processing Area" or the "Plant Area."

### i.    The Kiln Area.

29.    In the "Kiln Area" at the Norlite Facility, the shale is heated at high temperatures in two dry-process rotary kilns to produce the various materials specified above.

30.    After it is heated, the materials exit from the kilns into a clinker cooler. The materials eventually exit the clinker cooler via a conveyor and are dropped off of the conveyor into two large "clinker piles."  Between the two kilns, Defendants produce a total of approximately 233,000 tpy of materials that are at one point stored in the clinker piles.

31.    A front-end loader is used to transfer the materials from the kiln 2 clinker pile to the kiln 1 clinker pile, and the materials are then transferred to the "Finish Plant Area" via another conveyor.  Even as materials are collected and removed, more materials are repeatedly and continuously deposited into the clinker piles.  As a result, there are two clinker piles that continuously exist at the Norlite Facility.

-8-

32.     The Kiln Area also includes a muck pile, which is a collection of materials that include baghouse dust, aggregate fines, and other rejected or off-spec product.  Defendants actively, repeatedly, and continuously feed these materials that are in the muck pile to the Finish Plant Area.

33.     Sources of fugitive dust emissions in the Kiln Area include the conveyors, the material-transfer points, the material piles (including the clinker piles and the muck pile), the material handling by front-end loaders, the kilns, and the clinker coolers.

34.     The Kiln Area is operational 24 hours a day, 7 days a week, 365 days a year, except during maintenance.

**ii.    The Finish Plant Area.**

35.     From the Kiln Area, the materials are transported from the kiln 1 clinker pile via conveyor to a "grizzly" machine in the Finish Plant Area.  The grizzly sorts out materials that are considered to be too large.  The materials that pass through the grizzly are then transported to the screens building for screening, and the materials are then deposited onto various conveyors depending on material size to be transported into storage piles.

36.     The four categories of material size are the following: 3/4" aggregate; 3/8" aggregate; oversized material; and fines.

-9-

37.     The 3/4" and 3/8" aggregate materials are deposited onto short-term storage piles and are then moved to long-term storage piles by front-end loader.

38.     The material that is sorted onto the fines conveyor is transported to piles in a storage area for future addition into block mix.  Block mix consists of a mixture of aggregate material and baghouse dust.  Materials from two baghouse dust silos are sent via conveyor to be deposited onto a short-term block-mix pile by way of a stationary belt and radial stacker.

39.     The oversized material passes through an "El Jay crusher," is crushed and broken up, is then sent back to the grizzly via a return conveyor, and ultimately is screened and sorted by product size, as discussed above.

40.     Sources of fugitive dust emissions in the Finish Plant Area include the conveyors, the stackers, the grizzly, the crusher, the material-transfer points, the material piles, and the material handling by front-end loaders.

41.     With respect to operations that consist of storing materials, no matter the stage of processing, the Finish Plant Area is operational 24 hours a day, 7 days a week, 365 days a year.  Otherwise, the Finish Plant operates two eight-hour shifts every weekday and one eight-to-ten-hour shift on Saturdays.

-10-

### iii.    **The Island Area.**

42.    The Island Area is used to store materials before customer shipping. Several long-term storage piles exist in this area, including block-mix storage piles, 3/4"-aggregate storage piles, and 3/8"-aggregate storage piles. Front-end loaders are used to load and unload these storage piles.

43.    Sources of fugitive dust emissions in the Island Area include the material-transfer points, the material piles, and the material handling by front-end loaders.

44.    Since operations include storing materials, no matter the stage of processing, the Island Area is operational 24 hours a day, 7 days a week, 365 days a year.

45.    In total among the various areas specified above, the sources of repeated and continuous fugitive dust emissions include, inter alia, the several conveyors, the several stackers, the grizzly, the crusher, the several material-transfer points, the several material piles (upwards of 25 separate piles in total), the several front-end loaders that transfer and/or handle materials at various locations in these areas, the kilns, and the clinker coolers.

## C.  **Fugitive Dust Emissions From the Norlite Facility.**

46.    The above specified sources of fugitive dust emissions at the Norlite Facility — including the various stockpiles, conveyors, and transfer points — are consistent with the definition of fugitive dust and its potential sources in the AP-42 Publication from the U.S. Environmental Protection Agency (the "EPA"). Specifically, according to AP-42, fugitive

-11-

dust is defined as "dust that arises from the mechanical disturbance of granular materials exposed to the air that is not discharged to the atmosphere in a confined flow stream." Further according to AP-42, common sources of fugitive dust from aggregate manufacturing include aggregate storage piles and crushing, screening, and material-transfer operations.

47.    Per the EPA's AP-42 Publication and Defendants' own FDP, fugitive dust emissions in general and those specifically from the Norlite Facility are generated by the application of wind forces and pressure that overcome the force of gravity on the particulates, as well as overcoming the force of adhesion between dust particulates and/or the surface upon which the particulates rest. The threshold wind velocity, or the wind velocity required to cause wind erosion, is dependent on particulate type and size.

48.    Once the cohesive forces between particulates are overcome and a particulate becomes airborne, the velocities necessary to transport these particulates are significantly less than those required to initially dislodge them from a surface. Indeed, once particulates are airborne, wind is not necessarily needed in order to generate and transport fugitive dust emissions. It is commonly recognized, including by Defendants, that wind erosion of material piles is the main, but not the only, source of fugitive dust emissions.

49.    Additionally, the EPA's AP-42 Publication and Defendants' own FDP evince that significant fugitive dust emissions can be caused by various material-handling activities. Specifically, for example, Defendants' FDP provides the following:

-12-

Material handling is another major source of fugitive dust emissions and includes a wide range of activities (crushing, screening, loading, unloading, and transferring material), types of equipment (trucks, front end loaders, railcars, ships, conveyors, etc.), and final or intermediate product destinations (storage piles, hoppers, conveyors, etc.). Dust emissions are produced when the cohesive forces between the dust particles are overcome by the force of impact onto a surface. Dust can also be emitted due to windstripping of material as it falls through an airstream, the displacement of material from an area due to boil-up, and the windstripping of material from a container/vehicle as it moves through the environment.

50.     Also, by Defendants' own admissions in its FDP, the overall control efficiency of dust suppression measures for certain emissions sources, as specified above, is 0%, meaning that no suppression measures are in place or those that are in place are not effective at all. According to Defendants, the overall control efficiency of dust suppression measures for other emissions sources ranges between as low as 20% to as much as 90%, but, upon information and belief, the actual efficiency, in fact, often is much lower than this range.

51.     Saratoga Sites residents and residents in surrounding communities throughout Cohoes, Watervliet, and Green Island have repeatedly and continuously experienced the deposit of fugitive dust emissions on both their real and personal property. These fugitive dust emissions are carried from the Norlite Facility and are deposited on and inside their vehicles and on the exteriors of and inside of their homes and apartments, including ending up in attics, air-conditioning and/or central-air systems, floors, window sills, pools, and other surfaces.

52.     In fact, the NYS Department of Environmental Conservation's (the "DEC") rap sheet of violations at the Norlite Facility evince a history of Defendants repeatedly

-13-

and continuously causing fugitive dust emissions from the Norlite Facility.  This includes the

following:

    i.    DEC Order on Consent (R4-0768-90-01), dated June 21, 1990, assessing a penalty of $38,000 and directing Norlite to undertake several actions relating to a best management practices plan to prevent or minimize the potential for release of kiln dust and shale fines to waters of the state.

    ii.    DEC Order on Consent (R4-1734-94-08), dated December 28, 1994, assessing a penalty of $200,000 for, among other violations, failing to properly operate the soda ash silo baghouse and storing finished product in piles near the south entrance to the Norlite Facility without continuously watering the piles in violation of the approved fugitive dust plan and best management plan.

    iii.    DEC Order on Consent (R4-2000-0420-27), dated July 13, 2000, assessing a penalty of $3,000 and addressing DEC sample results showing that clinker, fines, and block-mix material originated from the Norlite Facility and migrated to offsite snow banks and automobiles and requiring the submission of an engineering plan to prevent offsite dust, including areas of concern at the finish mill, block-mix handling, moving of clinker piles, fines pile storage, portable crusher, road watering, and placement of wind screens.

    iv.    DEC Notice of Violation ("NOV") issued on May 9, 2013 following a DEC inspection of the Norlite Facility in early 2012.  As part of this NOV, the DEC identified inadequacies in the Facility's then-existing Fugitive Dust Plan and requested upgrades to the same.

    v.    DEC Order on Consent (R4-2016-0718-127), dated November 14, 2016, assessing a penalty of $31,500 following Defendants' failure to provide records of daily observations of visible emissions from each emission unit for a series of dates in March and May 2016 and failure to conduct daily observations of visible emissions from the primary plant rock crusher.

This history of violations shows a repeating and continuing pattern of causing fugitive dust

emissions to be deposited offsite from the Norlite Facility and into the surrounding communities.

-14-

53.     This repeating and continuing pattern of causing and allowing fugitive dust emissions to be carried offsite from the Norlite Facility has continued up through the present day, as evinced by several recent occurrences.

54.     For example, on June 26, 2020, a cloud of fugitive dust emissions engulfed the Saratoga Sites premises and adjoining properties, which severely impeded the use of those properties and left a coating of fugitive dust emissions on vehicles, homes, apartments, and recreational areas, including the playground at Saratoga Sites.

55.     Again, on November 17, 2020, Saratoga Sites residents experienced a film of fugitive dust emissions that coated their vehicles, homes, apartments, and recreational areas.

56.     Yet again, on November 24, 2020, a massive dust storm occurred at Saratoga Sites and in the communities outside of Saratoga Sites. The fugitive dust emissions in this event were so great that there was limited to no visibility. These fugitive dust emissions again severely impeded the use of those properties and left a coating of fugitive dust emissions on vehicles, homes, apartments, and recreational areas, including the playground at Saratoga Sites.

57.     Yet again, on December 24, 2020, Christmas Eve, residents experienced brownish-blackish snow, as fugitive dust emissions were observed on fresh snowfall at Saratoga Sites, including on the playground and the areas immediately surrounding the residences, as well

-15-

as in various areas in other communities outside of Saratoga Sites. On this occasion, staff from the DEC confirmed the existence of the particulates.

58.    Yet again, on January 26, 2021, Saratoga Sites residents experienced a film of fugitive dust emissions coating their vehicles, homes, apartments, and recreational areas.

59.    On February 3, 2021, staff from the DEC were onsite at the Norlite Facility and observed dust being placed onto the muck pile there. The DEC staff noted that the location of the muck pile and the deposit of baghouse dust onto it made it a probable source of fugitive dust emissions. The muck pile is not enclosed and is an open pile. As early as 1995, Norlite misled the DEC by informing the DEC that it "no longer collects dust from baghouses onto an open pile," which statement is a complete misrepresentation given the observations by DEC staff on February 3, 2021.

60.    On February 8, 2021, staff from the DEC were onsite at both the Norlite Facility and Saratoga Sites. On that date, DEC staff observed fugitive dust emissions from block mix being emitted eastward over the property line for the Norlite Facility and into the surrounding community east of the Facility. At approximately the same time, the DEC staff at Saratoga Sites observed the fugitive dust emissions coming onto the Saratoga Sites premises and being deposited there.

-16-

61.    Yet again, on March 10, 2021, Saratoga Sites residents experienced a film of fugitive dust emissions coating their vehicles, homes, apartments, and recreational areas.  On this date, the deposited fugitive dust emissions were confirmed by DEC staff.

62.    While the above allegations concern more recent incidents and occurrences, fugitive dust emissions from the Norlite Facility have repeatedly and continuously occurred throughout the years up through these recent events.

63.    The DEC has acknowledged that "[p]revious investigations of the particle fallout from Norlite in the surrounding neighborhood have identified expanded shale from the on-site stockpiles of processed shale as the particles that are being deposited" offsite and in the communities surrounding the Norlite Facility.

64.    Also, on February 4, 2021, a high-level DEC representative acknowledged that complaints of such emissions were "ongoing prior" to these recent incidents and occurrences, and, indeed, at least one local resident has been complaining about the emissions for decades.

**D.  <u>Hazards and Dangers From the Fugitive Dust Emissions.</u>**

65.    The fugitive dust emissions from the Norlite Facility are known to contain dangerous and hazardous materials and substances.

-17-

66.     In particular, testing of the fugitive dust emissions taken from exterior surfaces at Saratoga Sites and from an attic in a house a short distance away from Saratoga Sites have confirmed that the emissions contain sharp crystalline silica quartz particulates, as well as glass particulates.

67.     Furthermore, the particulates of crystalline silica quartz and glass are especially dangerous and hazardous because having been exposed to high temperatures in the kilns, the edges and surfaces are cleaned to an optimally fresh condition that maximizes the deleterious effects of the sharp, angular surfaces and edges of these particulates.

68.     Additionally, testing confirmed that the particulates included bubbly, glass-matrixed shards that are the result of exposure to high temperatures.  The kilns at the Norlite Facility are the only places in the relevant area where temperatures high enough to cause this exist.

69.     The hazardous and dangerous effects of the crystalline silica quartz and glass in the fugitive dust emissions from the Norlite Facility have been scientifically documented and is well-known both inside and outside of the medical and scientific communities.  For example, exposure to these particulates can cause a fatal condition called silicosis, as well as other debilitating ailments, diseases, and/or conditions.

70.     The fugitive dust emissions from the Norlite Facility include particulates of crystalline silica quartz and glass that are small enough to be inhaled and/or ingested into the

-18-

human body. In fact, the smallest particulates are those most likely to become fugitive dust emissions because the threshold wind velocity and/or pressure necessary to carry these particulates will be lower due to the lower weight of these particulates.

71.     Indeed, Defendants have admitted the dangerous and hazardous effects of exposure to the crystalline silica quartz that can be found in their various products, which, again, are exposed to the elements at various locations at the Norlite Facility.

72.     Specifically, Defendants' own Safety Data Sheet ("SDS") for their products states that these products contain "Crystalline Silica Quartz," which is designated as a "Carcinogen Category 1" according to the United Nations Conference on Environment and Development's (the "UNCED") globally harmonized system of classification and labelling of chemicals (the "GHS"). According to the GHS, a Category 1 carcinogen is a "known or presumed human carcinogen[]," as opposed to a Category 2 carcinogen that only is a "suspected human carcinogen[]."

73.     Defendants' SDS further confirms that exposure to particulates, including fugitive dust emissions, in and/or from the materials at the Norlite Facility can cause silicosis. In particular, the SDS states the following:

> Long term exposure can cause silicosis. Silicosis is a respiratory disease, which can result in delayed, disabling and sometimes fatal lung injury. IARC and NTP have determined that crystalline silica can cause lung cancer in humans. . . . Excessive inhalation of respirable crystalline silica dust may cause a progressive, disabling and sometimes fatal lung disease called silicosis. Symptoms include cough, shortness of breath, wheezing, non-specific chest illness and reduced pulmonary function. This disease is exacerbated by smoking. Individuals with

-19-

silicosis are predisposed to develop mycobacterial infections (tuberculous and nontuberculous) and fungal infections. Inhalation of air with a very high concentration of respirable silica dust can cause the most serious forms of silicosis in a matter of months or a few years. Some epidemiologic studies have concluded that there is significant risk of developing silicosis even at airborne exposure levels that are equal to the recommended NIOSH REL, the ACGIH TLV, the OSHA PEL, and the MSHA Exposure Limit.

74.     Defendants' SDS also identifies the following diseases, ailments, and/or conditions as being caused by respirable crystalline silica quartz: scleroderma (an immune system disorder manifested by fibrosis of the lungs, skin and other internal organs), rheumatoid arthritis, systemic lupus erythematosus, sarcoidosis, chronic bronchitis, chronic obstructive pulmonary disease ("COPD"), emphysema, chronic kidney disease, and end-stage renal disease.

75.     Plaintiffs and the class members have been exposed to the crystalline silica quartz and glass in the fugitive dust emissions from the Norlite Facility. Several already have experienced detrimental respiratory symptoms, such as asthmatic symptoms, burning sensations in their respiratory pathways, nose bleeds, and pulmonary conditions. Upon information and belief, it can be reasonably anticipated that many more will experience these symptoms and the diseases, ailments, and/or conditions listed above in the future given the "delayed" progression of several of those diseases, ailments, and/or conditions.

**E.  Defendants' Disregard of Environmental Laws and Regulations.**

76.     As discussed above, Defendants have a long history of violations arising from fugitive dust emissions from the Norlite Facility. Some of these violations have resulted in enforcement action by the DEC, but many have not — either because the DEC chose not to

-20-

enforce, the violations have gone undetected by the DEC, and/or Defendants have failed to report the violations.

77. As a result, neither the various environmental laws and regulations nor enforcement by the DEC has effectively stopped or even curtailed Defendants' fugitive dust emissions, as they have been repeated and have continued to occur throughout the years, including as recently as March of 2021.

78. Furthermore, when it does begin enforcement proceedings, the DEC does not seek damages or relief for the significant harms, injuries, and deprivations of rights of the residents who live in the communities surrounding the Norlite Facility.

79. Accordingly, Plaintiffs have commenced and will prosecute this action to seek relief for the harms, injuries, and deprivations of rights that have been caused by the fugitive dust emissions from the Norlite Facility and for which the DEC does not have authority or jurisdiction to seek.

## CLASS ACTION ALLEGATIONS

80. Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "79" above as though set forth at length herein.

81. Plaintiffs bring this lawsuit on their own behalf and as a class action on behalf of all other persons similarly situated as members of the proposed classes pursuant to

-21-

N.Y. CPLR § 901. This action satisfies the numerosity, commonality, typicality, adequacy,

predominance, and superiority requirements of that statute.

82.    Plaintiffs bring this class action on behalf of the following classes, as set

forth below:

### Saratoga Sites Class
All individuals who are lessors of real property located in Saratoga Sites at the time that a class is certified in this action and/or who have been lessors of real property located in Saratoga Sites within the three years preceding the date of commencement of this action.

### Surrounding Communities Class
All individuals who are not within the Saratoga Sites Class and who are owners or lessors of real property located in the City of Cohoes, New York, the City of Watervliet, New York, and/or the Village of Green Island, New York and who live within one mile of the Norlite Facility at the time that a class is certified in this action and/or who have met this criteria within the three years preceding the date of commencement of this action.

### Saratoga Sites Biomonitoring Class
All individuals who meet the criteria of the Saratoga Sites Class and who have continuously resided at Saratoga Sites for a period of two consecutive years and that said residence occurred, in part or in whole, at any point within the three years preceding the date of commencement of this action.

### Surrounding Communities Biomonitoring Class
All individuals who meet the criteria of the Surrounding Communities Class and who have continuously resided in the City of Cohoes, New York, the City of Watervliet, New York, and/or the Village of Green Island, New York for a period of two consecutive years and that said residence occurred, in part or in whole, at any point within the three years preceding the date of commencement of this action.

83.    Excluded from the classes set forth above are: (a) Defendants, any entity

or division in which Defendants have a controlling interest, and their legal representatives,

-22-

officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family members; (d) any State or any of its agencies; (e) the Town of Cohoes; (f) the Village of Green Island; (g) the City of Watervliet; and (h) any individual who otherwise would be included under one or more of the class descriptions above but who has filed a lawsuit for personal injury for an illness related to exposure to fugitive dust emissions from the Norlite Facility, whether commenced before, during, or after the commencement of this action.

84.     Plaintiffs reserve the right to amend the class definitions set forth above if discovery and/or further investigation reveals that any class should be expanded, divided into subclasses, or modified in any way.  Plaintiffs also reserve the right to seek certification of only certain issues should it be necessary.

### A. <u>Numerosity</u>

85.     Although the exact number of class members is uncertain and can be ascertained only through appropriate discovery, the number is great enough such that joiner is impracticable.  Indeed, there are approximately 5,592 people in approximately 2,770 housing units within a one-mile radius of the Norlite Facility, including approximately 70 housing units at Saratoga Sites.  Each of the classes set forth above is sufficiently numerous to warrant class treatment, and disposition of the claims of these class members in a single action will provide substantial benefits to all parties and to the Court.

-23-

86.     Further, class members are readily identifiable from publicly available information regarding property ownership and/or residential history.

## B. Typicality

87.     Plaintiffs' claims are typical of the claims of the classes in that Plaintiffs, like all class members, meet the above criteria and who have incurred the various damages as alleged below.

88.     Moreover, the factual bases of Defendants' misconduct are common to all class members and represent a common thread of misconduct resulting in common injury to all class members and warranting common relief for all class members.

## C. Adequate Representation

89.     Plaintiffs will fairly and accurately represent and protect the interests of the class members.  Plaintiffs have retained counsel with experience litigating the theories of liability alleged below and in litigating class actions.  Furthermore, undersigned counsel has been continuously investigating Defendants' conduct at the Norlite Facility that is the basis of this litigation for several months, including working with relevant experts, reviewing thousands of pages of documents, and researching the relevant law and scientific literature.

90.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class members, and Plaintiffs' counsel have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to the class members.

-24-

**D.  Predominance of Common Questions**

      91.    Plaintiffs bring this action under N.Y. CPLR § 901 because there are numerous questions of law and fact common to Plaintiffs and the class members that predominate over any question affecting only individual class members.  The answers to these common questions will advance resolution of the litigation as to all class members.  These common legal and factual issues include:

    i.    Whether Defendants owed a duty to Plaintiffs and class members to refrain from causing fugitive dust emissions;

    ii.    Whether Defendants knew or should have known that their conduct was unreasonably dangerous, including Defendants' unreasonably dangerous use of various materials piles, conveyors, transfer points and Defendants' unreasonably dangerous crushing, screening, and material-transfer operations that are the sources of fugitive dust emissions;

    iii.    Whether Defendants knew or should have known that processing, handling, and/or storing aggregate materials, fines materials, and block-mix materials was reasonably likely to cause fugitive dust emissions;

    iv.    Whether Defendants breached a legal duty to Plaintiffs and the class members by processing, handling, and/or storing aggregate materials, fines materials, and block-mix materials in a manner that caused and is causing fugitive dust emissions, as described herein;

-25-

v.    Whether Defendants' breach of a legal duty caused fugitive dust emissions to be deposited offsite from the Norlite Facility and into the surrounding communities;

vi.    Whether it was foreseeable that Defendants' various stockpiles, conveyors, and transfer points are sources of fugitive dust emissions and are unreasonably dangerous and hazardous to human health and the environment;

vii.    Whether the fugitive dust emissions described herein substantially interfered and continues to substantially interfere with Plaintiffs' and the class members' rights to use and enjoyment of their property;

viii.    Whether the fugitive dust emissions described herein caused and continues to cause a continuous invasion of the property rights of Plaintiffs and the class members;

ix.    Whether Defendants caused the damages alleged in greater detail below;

x.    Whether Defendants caused fugitive dust emissions to enter, invade, intrude upon or injure the property rights of Plaintiffs and the class members;

xi.    What measures are necessary for the continuing monitoring and remediation of Plaintiffs and the class members' properties in order to ensure that any and all fugitive dust emissions from the Norlite Facility are eliminated and abated;

-26-

xii.      What measures are necessary to ensure the complete elimination and/or abatement of fugitive dust emissions from the Norlite Facility;

xiii.     Whether Plaintiffs and the class members are at increased risk of illness and harm as a result of the fugitive dust emissions due to their close geographical proximity to the Norlite Facility;

xiv.     Whether biomonitoring and surveillance is reasonable and necessary to assure early diagnosis and treatment of ailments, diseases, and/or conditions caused by fugitive dust emissions;

xv.     Whether early diagnoses and treatment of the ailments, diseases, and/or conditions caused by fugitive dust emissions will be beneficial to Plaintiffs and the class members; and

xvi.     Whether Defendants' conduct warrants the imposition of punitive damages.

## E.  **Superiority**

92.     Plaintiffs and class members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

93.     Absent a class action, most class members would likely find the cost of litigating their claims to be prohibitively high and, therefore, would have no effective remedy at law. Further, without class litigation, class members will continue to incur damages.

-27-

94.    Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

95.    In addition to the above, Plaintiffs bring this class action seeking injunctive relief because Defendants have acted or refused to act on grounds that apply generally to the classes, such that final injunctive relief or declaratory relief is appropriate with respect to each class as a whole.  Such injunctive relief includes, but is not limited to, an injunction to require a biomonitoring program sufficient to monitor class members' health to ensure they are adequately protected from the deleterious effects of crystalline silica quartz and glass on the human body, an injunction requiring Defendants to institute monitoring measures sufficient to ensure the cessation of fugitive dust emissions from the Norlite Facility, and an injunction requiring Defendants to institute several remedial measures sufficient to permanently prevent fugitive dust emissions from contaminating Plaintiffs' and the class properties, which injunctive relief is specified in greater detail below.

## FIRST CAUSE OF ACTION
### (Negligence)

96.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "95" above as though set forth at length herein.

-28-

97.    This claim is brought under New York law on behalf of the Saratoga Sites Class, the Surrounding Communities Class, the Saratoga Sites Biomonitoring Class, and the Surrounding Communities Biomonitoring Class.

98.    At all times hereinafter mentioned and at all times pertinent to this action, Defendants operated, maintained, supervised, and controlled the Norlite Facility.

99.    Defendants knew or should have known that the various sources of fugitive dust emissions described above would result in fugitive dust emissions that are hazardous to human health and the environment.

100.    Defendants had a duty to take adequate safety precautions in order to ensure that these emissions were not released into the surrounding environment and/or communities, including residences.

101.    Defendants had a duty to take all reasonable measures to ensure that emissions would be effectively contained and not discharged into the surrounding environment and/or communities, including residences.

102.    Defendants had a duty to ensure that their operations did not unreasonably endanger the surrounding environment and/or communities, including residential properties and the air relied upon by Plaintiffs and the class members.

-29-

103.    Defendants repeatedly and continuously breached the above-stated duties by unreasonably processing, handling, and/or storing aggregate materials, fines materials, and block-mix materials in a manner that caused fugitive dust emissions to enter the surrounding environment and/or communities, including residences.

104.    Defendants knew of the dangerous fugitive dust emissions and permitted the same to continue without any warnings to Plaintiffs or the class members.

105.    Defendants repeatedly and continuously have acted with a conscious indifference to and in wanton and reckless disregard for the safety and rights of the Plaintiffs and the class members, including acting in a manner that is extreme and outrageous by all standards of decency.

106.    Defendants have created an unreasonable risk of bodily harm to Plaintiffs and the class members and/or a threat to their own physical safety.

107.    As a result of Defendants' breach, Plaintiffs' real and personal property in and around the Norlite Facility, including, but not limited to, the air, have become contaminated and are reasonably likely to be contaminated in the future with unsafe levels of fugitive dust emissions.  Indeed, through the negligent, reckless, and/or intentional acts and/or omissions alleged herein, Defendants have directly and proximately caused fugitive dust emissions to be deposited offsite from the Norlite Facility and into the surrounding communities.

-30-

108.    These fugitive dust emissions have damaged the real and personal property of Plaintiffs and the class members by repeatedly and continuously coating that property with highly dangerous and hazardous particulates, thereby contaminating their property, as well as depriving and continuing to deprive them of safe, breathable air.

109.    The fugitive dust emissions have directly and proximately caused and continue to cause damage to the exterior surfaces of residential structures, the exterior surfaces of vehicles, air conditioning and/or central-air units, pools, the interiors of residential structures, various types of personal property stored outdoors and indoors, and other forms of personal property.  This damage has caused Plaintiffs and the class members to undertake replacements, repairs, cleaning, maintenance, and other corrective actions that would not have otherwise been necessary but for the fugitive dust emissions from the Norlite Facility.

110.    By exposing Plaintiffs and the class members to unsafe levels of fugitive dust emissions, Defendants have directly and proximately caused and continue to cause exposure to and the introduction of fugitive dust emissions into Plaintiffs' and the class members' bodies. Upon information and belief, this has caused the accumulation of crystalline silica quartz and/or glass in Plaintiffs' and the class members' bodies, thereby making it reasonably anticipated that medical monitoring and/or testing will be necessary to monitor their health for and to diagnose at an early stage any ailments, diseases, and/or conditions associated with this exposure.

111.    As a direct and proximate result of Defendants' acts and/or omissions as alleged herein, Plaintiffs and the class members have suffered general, special, incidental, and

-31-

consequential damages resulting from the following: (i) damage to their real and personal property, including loss of use and additional measures necessary for the cleaning and/or maintenance of the same; (ii) the costs and expenses that are necessary for a biomonitoring protocol for Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members to monitor their health and diagnose at an early stage any ailments, diseases, and/or conditions associated with exposure, inhalation, or ingestion of fugitive dust emissions; (iii) the costs and expenses that are necessary for the continuing investigation, treatment, remediation, and monitoring, including the necessary monitoring and/or abatement equipment, of their respective properties, including the air in and around those properties; (iv) extreme mental anguish; (v); severe emotional distress; (vi) the fear of physical harm; and (vii) other general, special, incidental, and consequential damages.

112.    Additionally, since Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of the health, safety, and property of Plaintiffs and the class members, Defendants' conduct warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

## SECOND CAUSE OF ACTION
### (Private Nuisance)

113.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "112" above as though set forth at length herein.

-32-

114.    This claim is brought under New York law on behalf of Plaintiffs, the Saratoga Sites Class, the Surrounding Communities Class, the Saratoga Sites Biomonitoring Class, and the Surrounding Communities Biomonitoring Class.

115.    As alleged in the class definitions above, this claim is limited to the residents within a one-mile radius of the Norlite Facility.  While, upon information and belief, the fugitive dust emissions, especially the finer, smaller particulates, from the Norlite Facility travel much farther than that, the detrimental effects of the emissions on residents within this area are so severe as to cause the damages alleged herein.

116.    Defendants, through the repeated and continuing negligent, reckless, unreasonable, and/or intentional acts and/or omissions alleged herein, have caused fugitive dust emissions to be deposited offsite from the Norlite Facility and into the surrounding communities.

117.    The fugitive dust emissions have substantially interfered with the rights of Plaintiffs and the class members to use and enjoy their properties.  It has caused and is causing Plaintiffs and the class members to, inter alia, address the repeated and continuous accumulation of fugitive dust emissions on their real and personal properties, to refrain from using their property in the manner that each so chooses, and to refrain from various activities of daily living, each of which has, in turn, caused significant inconvenience and expense.

-33-

118. Defendants' repeated and continuing negligent, reckless, unreasonable, and/or intentional acts and/or omissions were unreasonable in character and constitute a repeated and continuous invasion of property rights of Plaintiffs and the class members.

119. Defendants failed to keep their dangerous and hazardous fugitive dust emissions within the bounds of the Norlite Facility and failed to stop all fugitive dust emissions from entering into the atmosphere, thereby being transported to Plaintiffs' and the class members' properties. Defendants have long known that these emissions were being deposited onto these properties and failed to prevent the same from ever occurring, and Defendants thereby acted intentionally when they continued to allow this nuisance with the full knowledge of repeated and continuing emissions onto and damage to Plaintiffs' and class members' properties.

120. That the aforesaid acts and/or omissions of Defendants in permitting the fugitive dust emissions to permeate Plaintiffs' and the class members' properties was deliberate and intentional and a violation of the rights of Plaintiffs and the class members.

121. As a direct and proximate result of Defendants' acts and/or omissions as alleged herein, Plaintiffs and the class members have suffered general, special, incidental, and consequential damages resulting from the loss of use and enjoyment of their property. These damages include, but are not limited to, the following: (i) monetary relief sufficient to relocate Plaintiffs and the class members at no additional cost to them, which is necessary to compensate Plaintiffs and the class members for the loss of their right to reside at their properties due to Defendants causing an unsafe and threatening living environment there; (ii) in the alternative to

-34-

(i), monetary relief sufficient for the continuing investigation, monitoring, treatment, and remediation, including the installation and operation of any necessary pollution monitoring and/or abatement equipment, of their respective properties and the air quality in and around those properties to ensure that no fugitive dust emissions from the Norlite Facility are being deposited thereon; (iii) in the alternative to (i), monetary relief sufficient for the removal of fugitive dust emissions from their properties and the remediation and/or restoration of those properties; and (iv) any and all other monetary relief for the general, special, incidental, and consequential damages resulting from Defendants' ongoing nuisance.

122.    In addition to the above and/or in the alternative to the relief sought above, Plaintiffs and the class members seek injunctive relief, including, but not limited to, the following: (i) implementing a mandatory protocol requiring Defendants to regularly test and/or monitor Plaintiffs' and the class members' properties, including the air, for the presence of fugitive dust emissions and to continue the same to ensure that all fugitive dust emissions have ceased and are no longer occurring, which testing shall be performed by an independent monitor chosen by Plaintiffs and paid for by Defendants; (ii) implementing a mandatory protocol requiring Defendants to remediate and/or treat Plaintiffs' and the class members' properties in order to ensure that all fugitive dust emissions and hazardous effects of the same are removed from those properties, including using any and all abatement devices; (iii) establishing a biomonitoring protocol for Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members to monitor their health for and to diagnose at an early stage any ailments, diseases, and/or conditions associated with exposure,

-35-

inhalation, or ingestion of fugitive dust emissions; (iv) requiring Defendants to completely enclose each and every source of fugitive dust emissions at the Norlite Facility, including conveyors, stackers, material piles, front-end loaders, and all material-transfer and/or storage points; and (v) additional steps, to be proven at trial, that are determined necessary to remediate Plaintiffs' and all class members' properties and/or residences to eliminate the presence of fugitive dust emissions and to prevent future emissions.

123.    Additionally, since Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of the health, safety, and property of Plaintiffs and the class members, Defendants' conduct warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

## THIRD CAUSE OF ACTION
### (Trespass)

124.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "123" above as though set forth at length herein.

125.    This claim is brought under New York law on behalf of the Saratoga Sites Class, Surrounding Communities Class, the Saratoga Sites Biomonitoring Class, and the Surrounding Communities Biomonitoring Class.

126.    Plaintiffs and the class members are owners and/or lessors of real properties with the right of possession thereof.

-36-

127.     Defendants repeatedly and continuously negligently, recklessly, and/or intentionally processed, handled, and/or stored aggregate materials, fines materials, and block-mix materials and caused fugitive dust emissions from the same to enter, invade, intrude upon, and injure the right of Plaintiffs and the class members to possess their properties.

128.     Plaintiffs and the class members have not consented and do not consent to the intrusion of fugitive dust emissions as alleged herein.  Defendants knew or reasonably should have known that Plaintiffs and the class members would not and did not consent to this repeated and continuing trespass.

129.     As a direct and proximate result of Defendants' acts and/or omissions as alleged herein, the fugitive dust emissions have caused Plaintiffs and class members to suffer property damage, including general, special, incidental, and consequential damages, including those set forth in detail above.

130.     Additionally, since Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of the health, safety, and property of Plaintiffs and the class members, Defendants' conduct warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

## FOURTH CAUSE OF ACTION
### (Strict Liability for Abnormally Dangerous Activity)

131.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs "1" through "131" above as though set forth at length herein.

-37-

132.    In the alternative to the first cause of action set forth above, Plaintiffs bring this claim under New York law.

133.    Defendants' repeated and continuous negligent, reckless, and/or intentional processing, handling, and/or storage of aggregate materials, fines materials, and block-mix materials constituted an abnormally dangerous activity for which Defendants are strictly liable. Specifically, the ultra-dangerous and hazardous nature of these materials rendered Defendants' processing, handling, and/or storage of them to be an abnormally dangerous activity.

134.    Defendants' processing, handling, and/or storage of aggregate materials, fines materials, and block-mix materials, as described herein, was inappropriate to the place where it was carried out, especially given the extremely close proximity to Saratoga Sites and the surrounding communities where Plaintiffs and the class members reside.

135.    Furthermore, Defendants' repeated and continuous creation of fugitive dust emissions and reckless disregard for the consequences of those actions carried a high degree of risk of harm to others, to others' property, and a likelihood that any such harm would be great. Indeed, as alleged above, the result of Defendants' conduct is all too clear and has been all too clear for decades now.

136.    As a result of Defendants' abnormally dangerous activities, Plaintiffs and the class members have suffered and continue to suffer injuries and harm to their properties,

-38-

including the general, special, incidental, and consequential damages, including those that are set forth in detail above.

137.    Additionally, since Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of the health, safety, and property of Plaintiffs and the class members, Defendants' conduct warrants an award of punitive damages in an amount sufficient to deter such conduct in the future.

## DAMAGES SOUGHT BY THE CLASS

138.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs "1" through "137" above as though set forth at length herein.

139.    Plaintiffs and the class members have sustained and will continue to sustain damages to their properties and health as a result of Defendants' actions. As a result, Plaintiffs and the class members seek monetary damages for each violation, act, and/or omission set forth above in the first through fourth causes of action. In particular, Plaintiffs and the class members seek a monetary award sufficient to compensate them for the various forms of damages alleged above.

140.    Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members also seek consequential monetary damages sufficient to fund a biomonitoring program that is reasonably tailored to the expenses

-39-

and costs for medical treatment that can be reasonably anticipated based on Plaintiffs' and the class members' exposure to the fugitive dust emissions from the Norlite Facility.

141.    Further, because Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of the health, safety, and property of Plaintiffs and the class members, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

142.    In addition to the above and/or in the alternative, Plaintiffs and the class members seek injunctive relief as set forth above.

143.    Plaintiffs and the class members will also seek an award of attorneys' fees, expenses, disbursements, and costs, as permitted under N.Y. CPLR § 909.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully demand judgment in favor of Plaintiffs and against Defendants as follows:

(i)    An order certifying the proposed Saratoga Sites Class, Surrounding Communities Class, Saratoga Sites Biomonitoring Class, and Surrounding Communities Biomonitoring Class; designating Plaintiffs as the named representatives of the respective classes; and designating the undersigned as Class Counsel;

-40-

(ii)    A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs and of the class members;

(iii)   On the first and fourth causes of action, a monetary award for Plaintiffs' and the class members' general, special, incidental, and consequential damages, including, but not limited to, the following: (i) damage to their real and personal property, including loss of use and additional measures necessary for the cleaning and/or maintenance of the same; (ii) the costs and expenses that are necessary for a biomonitoring protocol for Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members to monitor their health for and to diagnose at an early stage any ailments, diseases, and/or conditions associated with exposure, inhalation, or ingestion of fugitive dust emissions; (iii) the costs and expenses that are necessary for the continuing investigation, treatment, remediation, and monitoring, including the necessary monitoring and/or abatement equipment, of their respective properties, including the air in and around those properties; (iv) extreme mental anguish; (v); severe emotional distress; (vi) the fear of physical harm; and (vii) other general, special, incidental, and consequential damages;

(iv)    On the second and third causes of action, a monetary award for Plaintiffs' and the class members' general, special, incidental, and consequential

-41-

damages, including, but not limited to, the following: (i) monetary relief

sufficient to relocate Plaintiffs and the class members at no additional cost

to them, which is necessary to compensate Plaintiffs and the class

members for the loss of their right to reside at their properties due to

Defendants causing an unsafe and threatening living environment there;

(ii) in the alternative to (i), monetary relief sufficient for the continuing

investigation, monitoring, treatment, and remediation, including the

installation and operation of any necessary pollution monitoring and/or

abatement equipment, of their respective properties and the air quality in

and around those properties to ensure that no fugitive dust emissions from

the Norlite Facility are being deposited thereon; (iii) also in the alternative

to (i), monetary relief sufficient for the removal of fugitive dust emissions

from their properties and the remediation and/or restoration of those

properties; and (iv) any and all other monetary relief for the general,

special, incidental, and consequential damages resulting from Defendants'

ongoing nuisance and trespass;

(v)    On the second and third causes of action and in addition to the above

and/or in the alternative to the above, Plaintiffs and the class members

seek injunctive relief, including, but not limited to, the following: (i)

implementing a mandatory protocol requiring Defendants to regularly test

and/or monitor Plaintiffs' and the class members' properties, including the

air, for the presence of fugitive dust emissions and to continue the same to

-42-

ensure that all fugitive dust emissions have ceased and are no longer occurring, which testing shall be performed by an independent monitor chosen by Plaintiffs and paid for by Defendants; (ii) implementing a mandatory protocol requiring Defendants to remediate and/or treat Plaintiffs' and the class members' properties in order to ensure that all fugitive dust emissions and hazardous effects of the same are removed from those properties, including using any and all abatement devices; (iii) establishing a biomonitoring protocol for Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members to monitor their health and diagnose at an early stage any ailments, diseases, and/or conditions associated with exposure, inhalation, or ingestion of fugitive dust emissions; (iv) requiring Defendants to completely enclose each and every source of fugitive dust emissions at the Norlite Facility, including conveyors, stackers, material piles, front-end loaders, and all material-transfer and/or storage points; and (v) additional steps, to be proven at trial, that are determined necessary to remediate all class members' properties and/or residences to eliminate the presence of fugitive dust emissions and to prevent future emissions;

(vi)   On all causes of action, an award of punitive damages in an amount sufficient to deter Defendants' conduct alleged above in the future;

(vii)  An award of attorneys' fees, expenses, disbursements, and costs, as permitted by law;

-43-

(viii)    An award of pre-judgment and post-judgment interest, as provided by law; and

(ix)    Such other and further relief which the Court deems just and proper.

Dated: March 11, 2021
       Saratoga Springs, New York

**RUPP BAASE PFALZGRAF CUNNINGHAM, LLC**
*Attorneys for Plaintiffs and Class Counsel*

_____
Phillip A. Oswald, Esq.
25 Walton Street
Saratoga Springs, NY 12866
Tel: (518) 886-1902
oswald@ruppbaase.com

**TO:**    **NORLITE, LLC**
      628 South Saratoga Street
      Cohoes, NY 12047

      **TRADEBE ENVIRONMENTAL SERVICES, LLC**
      234 Hobart Street
      Meriden, CT 06450

      **TRADEBE TREATMENT AND RECYCLING NORTHEAST, LLC**
      234 Hobart Street
      Meriden, CT 06450

-44-

NEW YORK STATE SUPREME COURT
COUNTY OF ALBANY

---

**Plaintiff / Petitioner:**

DEBRA HILL, et al.

**Defendant / Respondent:**

NORLITE, LLC, et al.

---

**AFFIDAVIT OF SERVICE**

**Index No:**
**902279-21**

State of New York, County of Albany

That on <u>March 17 2021</u> AT 11:02 AM AT NYS Secretary of State 1 Commerce Plaza, Albany, NY 12210, deponent served **Notice of Electronic Filing, Summons and Class Action Complaint** on <u>TRADEBE ENVIRONMENTAL SERVICES, LLC (Pursuant to Section 303 of the Limited Liability Company Law)</u>

| | |
|---|---|
| ☐ | **Individual/Personal:** by delivering a true copy of each to said personally. |
| ☒ | **Corporation:** by delivering two true copies to the NYS Secretary of State by personal service of Sue Zouky (Business Document Specialist 2 & designated agent) at the NYS Secretary of State who is authorized to accept service. |
| ☐ | **Suitable Person:** by delivering thereat, a true copy to _____ a person of suitable age and discretion. |
| ☐ | **Affixing to Door:** by affixing a true copy to the door thereof, after deponent was unable, with due diligence to serve _____ _____ or a person of suitable age and discretion thereat, having attempted service on _____ |
| | Residence/Employment Confirmation: _____ _____ |
| ☐ | **Mailing:** Deponent mailed a true copy of said documents in a postpaid sealed wrapper properly addressed to said defendant/witness/respondent at _____, which is defendant's/witness's/respondent's last known address/workplace. Said mailing was performed on _____. |
| | ☐ The mailing was by first class/certified/registered mail. Certified or registered # _____ |
| | ☐ Return Receipt Requested |
| ☐ | **Military Service:** I asked the person served whether defendant/witness/respondent was in active military service of the United States or of the State of New York and received a negative reply. |

☐ Witness Fee Provided: _____
☒ Agency Fee Provided: $40.00
**Description:**
Approximate Age:  66          Ethnicity:  Caucasian                    Gender:  Female
Approximate Height:  5'1"          Other                    Approximate Weight:  115-125
Hair:  Gray          Other _____

*Sheldon Lee*

Sheldon Lee

Sworn to before me on ___ 3/17/21 ___

_____
Notary Public

**Albany Investigation & Process Services, LLC**
40 Colvin Aveune Suite 203
Albany, NY 12206

MICHAEL J. ALVARO
Notary Public State of New York
Qualified In Albany County
Commission Expires February 16, 2023

Case 1:21-cv-00439-ECC-DJS   Document 2   Filed 04/16/21   Page 49 of 50

NEW YORK STATE SUPREME COURT
COUNTY OF ALBANY

| | |
|---|---|
| **Plaintiff / Petitioner:** | **AFFIDAVIT OF SERVICE** |
| DEBRA HILL, et al. | **Index No:** |
| **Defendant / Respondent:** | **902279-21** |
| NORLITE, LLC, et al. | |

State of New York, County of Albany

That on March 17 2021 AT 11:04 AM AT NYS Secretary of State 1 Commerce Plaza, Albany, NY 12210, deponent served **Notice of Electronic Filing, Summons and Class Action Complaint** on **NORLITE, LLC (Pursuant to Section 303 of the Limited Liability Company Law)**

[ ] **Individual/Personal:** by delivering a true copy of each to said personally.

[X] **Corporation:** by delivering two true copies to the NYS Secretary of State by personal service of Sue Zouky (Business Document Specialist 2 & designated agent) at the NYS Secretary of State who is authorized to accept service.

[ ] **Suitable Person:** by delivering thereat, a true copy to _____ a person of suitable age and discretion.

[ ] **Affixing to Door:** by affixing a true copy to the door thereof, after deponent was unable, with due diligence to serve _____ _____ or a person of suitable age and discretion thereat, having attempted service on _____

Residence/Employment Confirmation: _____ _____

[ ] **Mailing:** Deponent mailed a true copy of said documents in a postpaid sealed wrapper properly addressed to said defendant/witness/respondent at _____, which is defendant's/witness's/respondent's last known address/workplace. Said mailing was performed on _____.
 [ ] The mailing was by first class/certified/registered mail. Certified or registered # _____
 [ ] Return Receipt Requested

[ ] **Military Service:** I asked the person served whether defendant/witness/respondent was in active military service of the United States or of the State of New York and received a negative reply.

[ ] **Witness Fee Provided:** _____
[X] **Agency Fee Provided:** $40.00
**Description:**
Approximate Age: 66   Ethnicity: Caucasian   Gender: Female
Approximate Height: 5'1"   Approximate Weight: 115-125
Hair: Gray   Other _____

| | |
|---|---|
| *Sheldon Lee* | Sworn to before me on  3/17/21 |
| Sheldon Lee | Notary Public |

**Albany Investigation & Process Services, LLC**
40 Colvin Aveune Suite 203
Albany, NY 12206

MICHAEL J. ALVARO
Notary Public State of New York
Qualified in Albany County
Commission Expires February 16, 2023

NEW YORK STATE SUPREME COURT
COUNTY OF ALBANY

| | |
|---|---|
| **Plaintiff / Petitioner:** | **AFFIDAVIT OF SERVICE** |
| DEBRA HILL, et al. | |
| **Defendant / Respondent:** | **Index No:** |
| NORLITE, LLC, et al. | **902279-21** |

State of New York, County of Albany

That on March 17 2021 AT 11:01 AM AT NYS Secretary of State 1 Commerce Plaza, Albany, NY 12210, deponent served **Notice of Electronic Filing, Summons and Class Action Complaint** on TRADEBE TREATMENT AND RECYCLING NORTHEAST, LLC (Pursuant to Section 303 of the Limited Liability Company Law)

☐ **Individual/Personal:** by delivering a true copy of each to said personally.

☒ **Corporation:**  by delivering two true copies to the NYS Secretary of State by personal service of Sue Zouky (Business Document Specialist 2 & designated agent) at the NYS Secretary of State who is authorized to accept service.

☐ **Suitable Person:** by delivering thereat, a true copy to _____ a person of suitable age and discretion.

☐ **Affixing to Door:** by affixing a true copy to the door thereof, after deponent was unable, with due diligence to serve _____ _____ or a person of suitable age and discretion thereat, having attempted service on _____

Residence/Employment Confirmation: _____ _____

☐ **Mailing:** Deponent mailed a true copy of said documents in a postpaid sealed wrapper properly addressed to said defendant/witness/respondent at _____, which is defendant's/witness's/respondent's last known address/workplace. Said mailing was performed on _____.
   ☐ The mailing was by first class/certified/registered mail. Certified or registered # _____
   ☐ Return Receipt Requested

☐ **Military Service:** I asked the person served whether defendant/witness/respondent was in active military service of the United States or of the State of New York and received a negative reply.

☐ Witness Fee Provided: _____
☒ Agency Fee Provided: $40.00
Description:
Approximate Age:  66          Ethnicity:  Caucasian                          Gender:  Female
Approximate Height:  5'1"                         Approximate Weight:  115-125
Hair:  Gray          Other

_Sheldon Lee_
Sheldon Lee

Sworn to before me on          3/17/21

Notary Public

**Albany Investigation & Process Services, LLC**
40 Colvin Aveune Suite 203
Albany, NY 12206

MICHAEL J. ALVARO
Notary Public State of New York
Qualified In Albany County
Commission Expires February 16, 2023