**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

DEBRA HILL, BRITTANY MCNAIR, DAVID
OLIVENCIA, AUDREYANNA GALLARDO, JENNIFER
MALINOWSKI, CHELSEA STURTEVANT, ED                    1:21-cv-439 (BKS/DJS)
SOKOL, CHRISTOPHER SEVINSKY, MARGARET
FRANKLIN, and others similarly situated,

                                    Plaintiffs,

v.

NORLITE, LLC, TRADEBE ENVIRONMENTAL
SERVICES, LLC, and TRADEBE TREATMENT AND
RECYCLING NORTHEAST, LLC,

                                    Defendants.

---

**Appearances:**

*For Plaintiffs:*
Phillip A. Oswald
Rupp Baase Pfalzgraf Cunningham LLC
227 Washington Street
Saratoga Springs, NY 12866

*For Defendants:*
James P. Ray
Wystan M. Ackerman
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiffs Debra Hill, Brittany McNair, David Olivencia, Audreyanna Gallardo, Jennifer

Malinkowski, Chelsea Sturtevant, Ed Sokol, Christopher Sevinsky, and Margaret Franklin bring

this proposed class action against Defendants Norlite, LLC, Tradebe Environmental Services,

LLC, and Tradebe Treatment and Recycling Northeast, LLC seeking monetary and injunctive relief for harms allegedly resulting from "fugitive dust emissions" caused by Defendants' operation of an aggregate materials production facility. (Dkt. No. 32). Plaintiffs assert claims in this diversity action for negligence, private nuisance, trespass, and strict liability on behalf of themselves and four proposed classes, as set forth in greater detail below. (*See id.* ¶¶ 84–148). Presently before the Court is Defendants' partial motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (Dkt. No. 33). Plaintiffs opposed Defendants' motion, and Defendants replied. (Dkt. Nos. 34, 35). For the following reasons, Defendants' motion is denied.

## II.      BACKGROUND[1]

### A.      The Norlite Facility

Defendants own and operate an "aggregate production and hazardous waste incineration facility" (the "Norlite facility") on an approximately 221-acre site in Albany County, New York. (Dkt. No. 32, ¶¶ 15–16). Approximately 40 acres of the site are located within the City of Cohoes, while the rest of the site is located in the Town of Colonie. (*Id.* ¶ 16). Plaintiffs allege that the Norlite facility was "acquired by" Tradebe Environmental Services, LLC and Tradebe Treatment and Recycling Northeast, LLC (together, the "Tradebe Parties") on or around April 15, 2011. (*Id.* ¶ 21). The Tradebe Parties use the Norlite facility "to dispose of and incinerate millions of pounds of hazardous waste." (*Id.* ¶ 22). The waste is used as fuel for the Norlite facility's "high-temperature, lightweight aggregate kilns ('LWAK') to manufacture, produce,

---

[1] The facts are drawn from the amended complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). The Court declines to consider the materials submitted by Plaintiffs with their opposition to Defendants' motion to dismiss. (*See* Dkt. No. 34-1); *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) ("Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself.").

and process dusty, toxic aggregate." (*Id.*). Plaintiffs allege that the Norlite facility "is the only commercial hazardous waste combustion facility in New York State," and one of only two facilities in the country with LWAKs that are "fueled by hazardous waste." (*Id.* ¶ 23). Plaintiffs allege that staff employed by the Tradebe Parties are "regularly present" at the Norlite facility "and/or regularly partake in overseeing and carrying out the day-to-day operations" there. (*Id.* ¶ 24). The Tradebe Parties "developed, implemented, and submitted" "fugitive dust analyses and control plans" and have "often been the main point of contact and liaison in these matters for the [Department of Environmental Conservation ("DEC")] and concerned citizens" from the surrounding communities. (*Id.* ¶ 25). The Tradebe Parties had an "active role" in preparing and implementing the "Fugitive Dust Plan" ("FDP"), which identifies the Norlite facility as the "Tradebe Environmental Services, LLC (Tradebe) Norlite facility." (*Id.* ¶ 26).

At the Norlite facility, Defendants use shale that is mined at an on-site quarry to produce block mix, 3/4" aggregate, 3/8" aggregate, and aggregate fines. (*Id.* ¶¶ 28, 30). These materials are "akin to cement" and are sold by Defendants to be used in "various construction markets." (*Id.* ¶¶ 28–29). In the "Kiln Area," the shale is "heated at high temperatures in two dry-process rotary kilns." (*Id.* ¶ 31). The heated shale exits the kilns into a "clinker cooler" and is transported by a conveyor into "two large 'clinker piles'" which "continuously exist at the Norlite Facility." (*Id.* ¶¶ 32–33). Material from the "kiln 2 clinker pile" is transferred to the "kiln 1 clinker pile" using a front-end loader, and then the materials are transferred by conveyor to the "Finish Plant Area." (*Id.* ¶ 33). The Kiln Area also has a "muck pile," which is comprised of aggregate fines, rejected or "off-spec" product, and "baghouse dust," which is ash from the waste that is incinerated at the Norlite facility. (*Id.* ¶ 34).

In the Finish Plant Area, the materials are put through a "grizzly" machine, which "sorts out materials that are considered to be too large" and passes the rest of the materials to screens which sort out the materials by size. (*Id.* ¶ 37). The 3/4" aggregate and 3/8" aggregate materials are "deposited onto short-term storage piles and are then moved to long-term storage piles by front-end loader." (*Id.* ¶ 39). The fines material is "transported to piles in a storage area for future addition into block mix," which is a mixture of aggregate material and baghouse dust. (*Id.* ¶ 40). Oversized material is passed through an "El Jay crusher" to be broken up and "sent back to the grizzly via a return conveyor" to be screened again. (*Id.* ¶ 41). Finally, materials are stored in the "Island Area" before they are shipped to customers. (*Id.* ¶ 44). The Island Area has several long-term storage piles, which are loaded and unloaded using a front-end loader. (*Id.*).

Plaintiffs allege that the Norlite facility's conveyors, stackers, grizzly machine, crusher machine, material transfer points, material piles, front-end loaders, kilns, and clinker coolers are all "sources of repeated and continuous fugitive dust emissions." (*Id.* ¶ 47).

## B.    The Area Surrounding the Norlite Facility and Plaintiffs

Residential communities "surround" the Norlite facility. (*Id.* ¶ 16). There is a railroad track on the eastern boundary of the Norlite facility that "also immediately adjoins [the] Saratoga Sites" apartment buildings. (*Id.* ¶ 17). The property lines for the Norlite facility and Saratoga Sites, which "consists of several residential apartment buildings that are owned and operated by the Cohoes Housing Authority," are "less than 200 feet apart." (*Id.*). The Kiln, Finish Plant, and Island Areas are "only between 300 feet to 700 feet away from several residential communities, including Saratoga Sites." (*Id.* ¶ 53).

Plaintiffs Hill, McNair, Malinowski, and Sturtevant all currently reside at Saratoga Sites and have resided there for at least three years. (*Id.* ¶¶ 1, 2, 5, 6). Plaintiffs Olivencia and Gallardo reside in Albany County and formerly resided at Saratoga Sites for 14 and 12 years, respectively.

(*Id.* ¶¶ 3–4). Plaintiff Sokol owns property in Cohoes, New York where he has resided for approximately 58 years. (*Id.* ¶ 7). Plaintiff Sevinsky owns property and has resided in Watervliet, New York for about five years. (*Id.* ¶ 8). Plaintiff Franklin owns property and resides in Green Island, New York, where she has lived for approximately four years. (*Id.* ¶ 9).

### C.    Fugitive Dust Emissions from the Norlite Facility

The U.S. Environmental Protection Agency's ("EPA's") AP-42 Publication defines "fugitive dust" as "dust that arises from the mechanical disturbance of granular materials exposed to the air that is not discharged to the atmosphere in a confined flow stream." (*Id.* ¶ 48). According to the AP-42 Publication, "common sources" of fugitive dust from aggregate materials manufacturing "include aggregate storage piles and crushing, screening, and material-transfer operations." (*Id.*). According to both the EPA and Defendants' FDP, fugitive dust emissions "are generated by the application of wind forces and pressure that overcome the force of gravity on the particulates, as well as overcoming the force of adhesion between dust particulates and/or the surface upon which the particulates rest." (*Id.* ¶ 49). The forces necessary to transport airborne particulates are "significantly less than those required to initially dislodge them from a surface." (*Id.* ¶ 50). The FDP states that "[m]aterial handling" is a "major source" of fugitive dust emissions and includes many activities and types of equipment. (*Id.* ¶ 51). The "overall control efficiency of dust suppression measures for certain emissions sources" at the Norlite facility is "0%," and between 20% and 90% for other emissions sources. (*Id.* ¶ 52).

Plaintiffs allege that Saratoga Sites residents and residents in "surrounding communities throughout Cohoes, Watervliet, and Green Island have repeatedly and continuously experienced the deposit of fugitive dust emissions on both their real and personal property." (*Id.* ¶ 54). The fugitive dust emissions are carried from the Norlite facility and are deposited on these residents' vehicles, the exterior and interior of their homes and apartments, attics, air conditioning or

central air systems, floors, window skills, pools, and other surfaces. (*Id.*). On June 26, 2020, for

example, a "cloud" of fugitive dust emissions "engulfed" Saratoga Sites and adjoining

properties, "imped[ing] the use of those properties and le[aving] a coating" of fugitive dust

emissions on vehicles, homes, apartments, and recreational areas. (*Id.* ¶ 57). Similarly, on

November 17, 2020, residents experienced a "film" of fugitive dust emissions. (*Id.* ¶ 58).

On November 24, 2020, there was a "massive dust storm" at Saratoga Sites and the

surrounding communities which resulted in "limited to no visibility." (*Id.* ¶ 59). On December

24, 2020, fugitive dust emissions caused "brownish-blackish snow," and DEC staff "confirmed

the existence" of particulates from the Norlite facility. (*Id.* ¶ 60). On January 26, 2021, Saratoga

Sites residents experienced another "film" of fugitive dust emissions. (*Id.* ¶ 61).

On February 3, 2021, DEC staff were present at the Norlite facility and "observed dust

being placed onto the muck pile." (*Id.* ¶ 62). DEC staff noted that the muck pile, which is an

open pile, was "a probable source of fugitive dust emissions." (*Id.*). On February 8, DEC staff

"observed fugitive dust emissions from block mix being emitted eastward over the property line

for the Norlite Facility and into the surrounding community." (*Id.* ¶ 63). DEC also observed the

fugitive dust emissions "being deposited" on the Saratoga Sites premises. (*Id.*). Similarly, on

March 10, Saratoga Sites residents experienced another "film" of emissions coating their

vehicles and homes, and DEC staff "confirmed" the "deposited fugitive dust emissions." (*Id.*

¶ 64; *see also id.* ¶ 55 (allegation summarizing DEC Orders on Consent and Notice of Violation

between 1990 and 2016)).

### D.    Hazards Posed by Fugitive Dust Emissions

The fugitive dust emissions from the Norlite facility contain "sharp crystalline silica

quartz particulates" and "glass particulates," which are "small enough to be inhaled and/or

ingested into the human body." (*Id.* ¶¶ 69, 73). These particulates are "especially dangerous and

hazardous" because the high temperatures to which they are exposed in the kilns "clean[s]" them to an "optimally fresh condition that maximizes the deleterious effects of the sharp, angular surfaces and edges." (*Id.* ¶ 70). Testing has also shown that the particulates include "bubbly, glass-matrixed shards" which result from exposure to high temperatures. (*Id.* ¶ 71). Plaintiffs allege that the hazardous nature of the crystalline silica quartz and glass particulates has been "scientifically documented" and is "well-known." (*Id.* ¶ 72). Exposure to these particulates "can cause a fatal condition called silicosis," among other diseases and conditions. (*Id.*).

The Safety Data Sheet for Defendants' products states that the products contain "Crystalline Silica Quartz," which the United Nations Conference on Environment and Development's "globally harmonized system of classification and labelling of chemicals" designates as a "Carcinogen Category 1," a "known or presumed human carcinogen." (*Id.* ¶ 75). The Safety Data sheet states that long-term exposure to particulates can cause silicosis, a "respiratory disease, which can result in delayed, disabling and sometimes fatal lung injury." (*Id.* ¶ 76). Symptoms of silicosis include "cough, shortness of breath, wheezing, non-specific chest illness and reduced pulmonary function." (*Id.*). According to the Safety Data Sheet, breathing in crystalline silica quartz particulates can also cause lung cancer, scleroderma, rheumatoid arthritis, systemic lupus erythematosus, sarcoidosis, chronic bronchitis, chronic obstructive pulmonary disease, emphysema, chronic kidney disease, and end-stage renal disease. (*Id.* ¶¶ 76–77). However, Defendants "never disclosed" information regarding the risks and dangers of the particulates in the fugitive dust emissions "in any of their community-relations materials" or provided any warnings in response to complaints. (*Id.* ¶ 78).

Plaintiffs allege that they and the class members "have been exposed to the crystalline silica quartz and glass in the fugitive dust emissions" from the Norlite facility. (*Id.* ¶ 79).

"Several" of them "already have experienced detrimental respiratory symptoms, such as asthmatic symptoms, burning sensations in their respiratory pathways, nose bleeds, and pulmonary conditions." (*Id.*). Plaintiffs allege that "it can be reasonably anticipated that many more will experience these symptoms" as well as the diseases and conditions listed above in the future. (*Id.*).

   **E.**   **Proposed Classes**

   Plaintiffs bring this class action on behalf of four proposed classes. (*See generally id.* ¶¶ 84–99). The "Saratoga Sites Class" consists of all individuals "who are lessors of real property located in Saratoga Sites at the time that a class is certified" or who were such lessors "within the three years preceding the date of commencement of this action." (*Id.* ¶ 86). The "Surrounding Communities Class" consists of all individuals who are not within the Saratoga Sites Class, who own or lease real property located in the City of Cohoes, the City of Watervliet, and/or the Village of Green Island, New York "and who live within one mile of the Norlite Facility" at the time a class is certified, or those who met such criteria within the three years preceding commencement of this action. (*Id.*).

   The "Saratoga Sites Biomonitoring Class" consists of those individuals who meet the criteria for the Saratoga Sites Class and "who have continuously resided at Saratoga Sites for a period of two consecutive years and that said residence occurred, in part or in whole, at any point within the three years preceding the date of commencement of this action." (*Id.*). Finally, the "Surrounding Communities Biomonitoring Class" consists of those individuals who meet the Surrounding Communities Class criteria and who have continuously lived in Cohoes, Watervliet, and/or Green Island "for a period of two consecutive years and that said residence occurred, in part or in whole, at any point within the three years" preceding commencement of this action. (*Id.*).

### III.    STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id*. (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV.    ANALYSIS

Plaintiffs assert claims for negligence, private nuisance, trespass, and strict liability against Defendants. (*See* Dkt. No. 32, ¶¶ 100–148). Defendants move to dismiss all claims against the Tradebe Parties, Plaintiffs' strict liability claim, and Plaintiffs' requests for medical monitoring and fear of physical harm damages.

#### A.    Claims Against the Tradebe Parties

Defendants move to dismiss all of Plaintiffs' claims against the Tradebe Parties, arguing that the amended complaint does not plausibly allege that the Tradebe Parties "are engaged in the operations" at the Norlite facility "which cause the fugitive dust emissions" or "are involved in the decision-making or operations related to" the activities allegedly causing Plaintiffs' harm. (Dkt. No. 33-1, at 12–13). Plaintiffs respond that they have sufficiently alleged the Tradebe Parties' "control over and administration of" the specific operations at the Norlite facility relevant to the control of dust emissions. (Dkt. No. 34, at 11–14).

Although much of the amended complaint refers to "Defendants," Plaintiffs make specific allegations about the Tradebe Parties, who "acquired" the Norlite facility in 2011. (Dkt. No. 32, ¶ 21). The Tradebe Parties "conduct[] a substantial amount of business at the Norlite Facility," including to "dispose of and incinerate millions of pounds of hazardous waste" which is used as fuel for the LWAKs. (*Id.* ¶ 22). Plaintiffs allege that "staff and/or representatives employed by [the Tradebe Parties] are regularly present at the Norlite Facility and/or regularly partake in overseeing and carrying out the day-to-day operations" there. (*Id.* ¶ 24). Tradebe personnel "respond to safety incidents," "modify procedures" based on unsafe conditions or acts, "provide training to employees onsite," and "develop and implement plans for certain aspects of the operations—including those that cause fugitive dust emissions." (*Id.*). Plaintiffs further allege that the Tradebe Parties have "an active role in the responsibility and duty to control fugitive dust emissions from the Facility." (*Id.* ¶ 25). The Tradebe Parties "developed, implemented, and submitted" "fugitive dust analyses and control plans." (*Id.*). For example, the Tradebe Parties "had an active role in preparing and implementing" the "Fugitive Dust Plan," which identifies the Norlite Facility as the "Tradebe Environmental Services, LLC (Tradebe) Norlite facility." (*Id.* ¶ 26). They also had an "active role in procuring" the FDP, "communicating with the DEC regarding it, and administering it." (*Id.*; *see also id.* ¶ 25 (alleging that Tradebe representatives "have often been the main point of contact and liaison in [fugitive dust] matters for the DEC and concerned citizens from the communities surrounding the Norlite Facility")).

At this early stage, the Court finds that Plaintiffs have sufficiently alleged the involvement of the Tradebe Parties in the operations of the Norlite Facility that allegedly cause fugitive dust emissions such that the claims against the Tradebe Parties may proceed. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 121 (2d Cir. 2013) (noting

that, under New York law, "every one who creates a nuisance or participates in the creation or maintenance thereof is liable for it" (quoting *Penn Cent. Transp. Co. v. Singer Warehouse & Trucking Corp.*, 86 A.D.2d 826, 828 (1st Dep't 1982) (brackets omitted))); *Eisman v. Vill. of E. Hills*, 149 A.D.3d 806, 809–10 (2d Dep't 2017) (affirming denial of motion to dismiss where the third-party complaint alleged that the third-party defendants "personally engaged in acts of negligence with respect to the design and implementation of the rainwater drainage plan for the plaintiffs' home").[2] While a corporate officer or owner is "not held liable for the negligence of the corporation merely because" of that "official relationship," the officer or owner "will be held liable if it is established 'that the officer was a participant in the wrongful conduct.'" *Abbott v. Tonawanda Coke Corp.*, 104 A.D.3d 1188, 1189 (4th Dep't 2013) (quoting *Olszewski v. Waters of Orchard Park*, 303 A.D.3d 995, 996 (4th Dep't 2003)).

In *Abbott*, the complaint alleged that the owner and officer of Tonawanda Coke Corporation "was or should have been aware of the relevant environmental regulations, was ultimately responsible for reporting benzene emissions to the Environmental Protection Agency, and personally supervised and exercised control over Tonawanda Coke's operations." *Id.* at 1189–90. The court therefore held that the plaintiffs had "alleged that [the owner] actively participated in the wrongful conduct by approving the policies that allegedly caused the environmental contamination." *Id.* at 1190. Similarly, here, Plaintiffs have alleged that the Tradebe Parties are "regularly present" at the Norlite Facility, "provide training to employees onsite," and "*develop and implement* plans for certain aspects of the operations—including those that cause fugitive dust emissions." (Dkt. No. 32, ¶ 24 (emphasis added)). Plaintiffs also allege that the Tradebe Parties "developed, implemented, and submitted" "fugitive dust analyses and

---

[2] The parties do not make any distinctions among the substantive claims asserted.

control plans" and were the "main point of contact in these matters for the DEC." (*Id.* ¶ 25). Plaintiffs further allege that the Tradebe Parties had an "active role in preparing and implementing" the FDP and in communicating with the DEC about it. (*Id.* ¶ 26); *cf. Eisman*, 149 A.D.3d at 809 (finding sufficient allegations that the third-party defendants "personally engaged in acts of negligence with respect to the *design and implementation* of the rainwater drainage plan" (emphasis added)). Taken together, these allegations suffice to plausibly allege that the Tradebe Parties "actively participated" in the conduct at issue, *Abbott*, A.D.3d at 1190, and indicate that Plaintiffs do not seek to hold the Tradebe Parties liable solely by virtue of their positions as owners of Norlite.

Accordingly, the Court denies Defendants' motion to dismiss all claims against the Tradebe Parties.[3]

###     B.     Strict Liability Claim

Plaintiffs assert a claim for strict liability for abnormally dangerous activity, on the ground that Defendants' "processing, handling, and/or storage of aggregate materials, fines materials, and block-mix materials constitute[s] an abnormally dangerous activity." (Dkt. No. 32, ¶ 140). Defendants move to dismiss Plaintiffs' claim for strict liability, arguing that Plaintiffs have not plausibly alleged the "inability to eliminate the risk [of the activity] by the exercise of reasonable care" or that the other factors set forth in *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977), are met. (Dkt. No. 33-1, at 15–20). Plaintiffs respond that they have plausibly pled facts regarding each of the *Doundoulakis* factors which weigh in favor of finding Defendants' activity to be abnormally dangerous. (Dkt. No. 34, at 18–28).

---

[3] The Court therefore need not address Defendants' argument that Plaintiffs failed to allege any facts that would warrant piercing the corporate veil. (Dkt. No. 33-1, at 13–15). The Court notes that, in any event, Plaintiffs represent that they do not seek to pierce the corporate veil in this case. (Dkt. No. 34, at 14).

Under New York law, "[o]ne who carries on an ultrahazardous or abnormally dangerous activity is strictly liable for the harm inflicted by the activity." *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 531 (S.D.N.Y. 2007) (citation omitted). Whether an activity is "abnormally dangerous and warrants imposition of strict liability" is a question of law for the Court to decide. *Id.* In New York, courts consider the following six factors to determine whether an activity is abnormally dangerous:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from [the activity] will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Doundoulakis*, 42 N.Y.2d at 448 (quoting Restatement (Second) of Torts § 520). No single factor is "determinative," and "an activity abnormally dangerous under one set of circumstances is not necessarily abnormally dangerous for all occasions." *Id.*

Here, considering these factors and accepting Plaintiffs' allegations as true, the Court finds that their strict liability claim may proceed. First, Plaintiffs allege that the way in which Defendants process, handle, and store the various materials produced at the Norlite facility results in toxic materials which are stored in "proven emission sources," leading to fugitive dust emissions. (*E.g.*, Dkt. No. 32, ¶¶ 35, 42, 45, 47–48, 141; *see also id.* ¶¶ 48–51 (alleging that the identified "sources of fugitive dust emissions" are "consistent with the definition of fugitive dust and its potential sources" in the EPA's AP-42 Publication)). Plaintiffs allege that the fugitive dust emissions, in turn, pose a risk of harm to their persons and real and personal property. (*Id.* ¶¶ 57–64 (alleging instances of fugitive dust emissions landing on real and personal property between June 26, 2020 and March 10, 2021), 68–79 (alleging the potential health hazards from

the inhalation or ingestion of crystalline silica quartz particulates)). The first *Doundoulakis* factor

therefore weighs in favor of finding that Defendants' handling of the aggregates materials is an

abnormally dangerous activity.

Second, Plaintiffs have also plausibly alleged a likelihood that the harm resulting from

Defendants' activity will be great. Plaintiffs allege that crystalline silica quartz has been

designated as a "Carcinogen Category 1," meaning the substance is a "known or presumed

human carcinogen." (*Id.* ¶ 75). Plaintiffs also allege that Defendants' Safety Data Sheet states

that long-term exposure to particulates can cause silicosis, a respiratory disease "which can result

in delayed, disabling[,] and sometimes fatal lung injury," among other conditions. (*Id.* ¶¶ 76–77).

Given these allegations, the second *Doundoulakis* factor also suggests that Defendants' handling

of the aggregate materials is abnormally dangerous. *Cf. Abbatiello*, 522 F. Supp. 2d at 533

(finding this factor "present" where the plaintiffs alleged that the substances at issue were

"highly toxic" with the "potential to cause" a variety of illnesses and diseases, including cancer

and liver disease); *Town of New Windsor v. Avery Dennison Corp.*, No. 10-cv-8611, 2012 WL

677971, at *12, 2012 U.S. Dist. LEXIS 27264, at *40 (S.D.N.Y. Mar. 1, 2012) (finding a

"plausible" high degree of risk of both "some contamination to Plaintiff's land" and "adverse

health effects to the people of New Windsor should they drink water from the Wells"

contaminated by solvents).

Defendants argue that the third factor—the inability to eliminate the risk by the exercise

of reasonable care—is the "most useful" factor and is unsatisfied here because Plaintiffs allege

that the risks associated with Defendants' activity *can* be eliminated by the exercise of

reasonable care. (Dkt. No. 33-1, at 16–18 (citing, inter alia, *German v. Fed. Home Loan Mortg.*

*Corp.*, 885 F. Supp. 537, 570 (S.D.N.Y.), *clarified on reargument*, 896 F. Supp. 1385 (S.D.N.Y.

1995))). For example, Defendants point to Plaintiffs' allegations that steps could be taken to mitigate or reduce the risk, including "monitoring measures sufficient to ensure the cessation of fugitive dust emissions" and "remedial measures sufficient to permanently prevent fugitive dust emissions." (*Id.* at 18 (citing Dkt. No. 32, ¶ 99); *see also* Dkt. No. 32, ¶ 55 (allegations regarding DEC orders and notices suggesting that steps could be taken to prevent fugitive dust emissions, including "continuously watering the piles")). Plaintiffs respond that there is no "categorical exclusion" of strict liability claims that are premised on the same conduct as negligence claims and that they are allowed to plead claims in the alternative. (Dkt. No. 34, at 22–24). Defendants are correct that courts have dismissed strict liability claims where the plaintiffs implicitly acknowledge that the exercise of reasonable care would reduce or eliminate the risk of the activity at issue. *See, e.g.*, *German*, 885 F. Supp. at 570 (dismissing strict liability claims for abnormally dangerous activity where the plaintiffs "implicitly admit[ted] that lead paint can be controlled" with reasonable care); *Nat'l R.R. Passenger Corp. v. N.Y. City Hous. Auth.*, 819 F. Supp. 1271, 1279 (S.D.N.Y. 1993) (dismissing claim for nuisance based on ultrahazardous activity where "[i]mplicit in plaintiff's allegation [wa]s the acknowledgment that had defendants exercised due care . . . no nuisance would have occurred"). However, because Plaintiffs have plausibly alleged facts supporting the other factors which make an activity abnormally dangerous, the Court finds that Plaintiffs' alternative pleading that Defendants' conduct was negligent does not bar their strict liability claim at this time. While Plaintiffs' negligence and strict liability claims may not both remain viable as the case progresses, the Court cannot say, based solely on the amended complaint, that Defendants' activity is not abnormally dangerous as a matter of law. *Cf. Andres v. Town of Wheatfield*, No. 17-cv-377, 2020 WL 7764833, at *7, 2020 U.S. Dist. LEXIS 244884, at *26–27 (W.D.N.Y. Dec. 30, 2020) (holding that plaintiffs

were "not required to elect either a negligence or strict liability theory of recovery" at the pleading stage but noting that plaintiffs "may be required to elect a theory of recovery" as the "case progresses" because the inability to eliminate the risk with reasonable care "is a key feature of strict liability").

With regard to the fourth factor, Plaintiffs allege that the "use of LWAKs to produce Defendants' materials is not a matter of common usage," because the Norlite facility "is the only facility in the state that uses waste-fueled LWAKs to produce these materials, and it is one of only two facilities in the country." (Dkt. No. 32, ¶ 145). Defendants argue that the "use of waste" to fuel the kilns is "irrelevant" because it has "no impact on the nature of the materials that exit the kilns" and that Plaintiffs "have not alleged that the type of kiln Norlite uses is what makes its activities abnormally dangerous." (Dkt. No. 33-1, at 19). Plaintiffs respond that the Norlite facility is the only one in the area to use "high enough" temperatures to create "bubbly, glass-matrixed shards," that the use of waste is relevant because it leads to "ash from incinerated waste" to which Plaintiffs are also exposed, and that the Court can use its "judicial experience and common sense" in determining whether an activity is commonly done. (Dkt. No. 34, at 24–26 (citing *Town of New Windsor*, 2012 WL 677971, at *12, 2012 U.S. Dist. LEXIS 27264, at *41–42)). Although it is not entirely clear whether all LWAKs operate at extremely high temperatures and whether there are other types of kilns which operate at such temperatures, because the Court must draw all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that Defendants' activity is not a matter of common usage.

Fifth, Plaintiffs allege that Defendants' processing, handling, and/or storage of the materials at issue is "inappropriate to the place" where it is carried out "given the extremely close proximity to Saratoga Sites and the surrounding communities." (Dkt. No. 32, ¶ 143).

Defendants argue that Plaintiffs' allegations in this regard are "conclusory" and note that Plaintiffs "fail to allege any facts related to the zoning classification of the Norlite Facility, the nature of the other surrounding properties, or the timing of development of Norlite and [] Saratoga Sites." (Dkt. No. 33-1, at 18). However, Plaintiffs have alleged that Defendants' operations take place 300 to 700 feet away from surrounding residential properties and communities, and that fugitive dust emissions from the Norlite facility have in fact been found in surrounding properties. (Dkt. No. 32, ¶¶ 53 (alleging that the Kiln, Finish Plant, and Island Areas are "only between 300 feet to 700 feet away from several residential communities"), 69–71 (alleging that testing of fugitive dust emissions taken from Saratoga Sites confirmed that the emissions came from the Norlite facility)). At this stage, Plaintiffs' allegations render Defendants' operations plausibly unsuitable for its location. *Cf. Town of New Windsor*, 2012 WL 677971, at *13, 2012 U.S. Dist. LEXIS 27264, at *42 (finding defendants' operations "plausibly not appropriate for their location" where plaintiff alleged that the operations occurred "adjacent to Plaintiff's property" and "close enough to the border of Defendants' property so that a solvent plume could extend past it").

Finally, Plaintiffs allege that the risks posed to surrounding communities "far outweigh[]" the value of Defendants' operations because the materials Defendants produce "are akin [to] and serve a similar utility as cement, which is widely available throughout the United States." (Dkt. No. 32, ¶ 146). Defendants argue that Plaintiffs "ignore the fact" that their products "make buildings safer, more environmentally friendly[,] and more energy-efficient." (Dkt. No. 33-1, at 19 (noting that the waste materials used "otherwise would have to be placed in landfills")). However, these facts are not alleged in Plaintiffs' complaint, and the Court therefore does not

consider them. Taking Plaintiffs' allegations as true, this factor also supports a conclusion that Defendants' activity is abnormally dangerous.

In sum, while Defendants' activity may be found not to be abnormally dangerous on a more developed record, the Court finds that at this stage Plaintiffs have plausibly alleged that the Defendants' "processing, handling, and/or storage of aggregate materials, fines materials, and block-mix materials" constitutes an abnormally dangerous activity giving rise to strict liability. Defendants' motion to dismiss Plaintiffs' strict liability claim is therefore denied.

### C.      Medical Monitoring

Plaintiffs seek as consequential damages the "costs and expenses that are necessary for . . . a biomonitoring protocol for Plaintiffs, the Saratoga Sites Biomonitoring Class members, and the Surrounding Communities Biomonitoring Class members to monitor their health and diagnose at an early stage any ailments, diseases, and/or conditions associated with exposure, inhalation, or ingestion of fugitive dust emissions." (Dkt. No. 32, ¶ 116). Defendants move to dismiss Plaintiffs' request for medical monitoring, arguing that Plaintiffs have not plausibly alleged a physical injury or causation between the fugitive dust emissions and the medical conditions to be monitored. (Dkt. No. 33-1, at 20–24). Plaintiffs respond that they have sufficiently alleged physical symptoms and property damage which can support consequential damages for medical monitoring. (Dkt. No. 34, at 14–18).

New York law does not recognize an independent cause of action for medical monitoring in the absence of an already existing tort, which requires an injury. *See generally Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439 (2013); *see also Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 501 (2d Cir. 2020) (noting that New York law does not recognize "an action for medical monitoring independently of the presence of a traditionally recognized tort cause of action"). To maintain an action for personal injury, a plaintiff must allege "some

injury," which the plaintiff can do by alleging that "'in the plaintiff's body' there is either a 'clinically demonstrable presence of toxins' 'or some physical manifestation of toxic contamination.'" *Benoit*, 959 F.3d at 501 (emphases omitted); *see id.* (noting that the word "clinical" refers to "phenomena that are observable"). If the plaintiff proves the claim for personal injury, the plaintiff "may be awarded, as consequential damages for such injury, the costs of medical monitoring." *Id.*

Here, the parties agree that the test for personal injury resulting from exposure to hazardous substances as summarized in *Benoit* applies, and Plaintiffs do not argue that they have alleged a "clinically demonstrable presence of toxins" in their bodies. (*See* Dkt. No. 34, at 15–16). Rather, the parties dispute whether Plaintiffs have plausibly alleged a "physical manifestation of toxic contamination." In this regard, Plaintiffs allege that they and the class members "have been exposed to the crystalline silica quartz and glass in the fugitive dust emissions from the Norlite Facility," and that "[s]everal already have experienced detrimental respiratory symptoms, such as asthmatic symptoms, burning sensations in their respiratory pathways, nose bleeds, and pulmonary conditions." (Dkt. No. 32, ¶ 79). Defendants argue that Plaintiffs' allegations "lack specificity," are pled "in a vague, conclusory manner," and fail to plausibly plead a causal connection between the fugitive dust emissions and the symptoms alleged. (Dkt. No. 33-1, at 23–24). Plaintiffs respond that they have plausibly pled a "physical manifestation" of toxic contamination, which can be done on a "class-wide basis without attributing specific symptoms to specific individuals." (Dkt. No. 34, at 14–16).

The Court concludes that Plaintiffs have plausibly alleged a "physical manifestation of toxic contamination" and therefore that the request for medical monitoring as a form of consequential damages may proceed. While Defendants argue that there "are many [possible]

reasons" for Plaintiffs' alleged respiratory symptoms "having nothing to do with the Norlite Facility," (Dkt. No. 33-1, at 23), Plaintiffs' allegations tie the symptoms to exposure to crystalline silica quartz and glass found in the fugitive dust emissions. Specifically, Plaintiffs allege exposure to such particulates and that several "already" have experienced the alleged respiratory symptoms. (Dkt. No. 32, ¶ 79). Plaintiffs further allege that the symptoms several of them have experienced "are indicative of conditions that can be caused by exposure" to the fugitive dust emissions. (Dkt. No. 34, at 16; *see* Dkt. No. 32, ¶ 76 (alleging that symptoms of silicosis include "cough, shortness of breath, wheezing, non-specific chest illness and reduced pulmonary function")). The amended complaint therefore plausibly alleges a physical manifestation of toxic contamination, and the lack of allegations specific to any particular Plaintiff or class member is not dispositive. *Cf. Sorrentino v. ASN Roosevelt Ctr. LLC*, 579 F. Supp. 2d 387, 390 (E.D.N.Y. 2008) (allowing request for medical monitoring to proceeding where "at least some of those [plaintiffs] exposed to" the mold at issue "have developed exposure-related health conditions").[4] Accordingly, Defendants' motion to dismiss Plaintiffs' request for medical monitoring damages is denied.

### D.    Fear of Physical Harm

The amended complaint also requests damages for "fear of future physical harm." (Dkt. No. 32, ¶ 117). To recover damages for the fear of future harm from exposure to a toxic substance, a plaintiff "must establish both that he was in fact exposed to the disease-causing agent and that there is a 'rational basis' for his fear of contracting the disease." *Wolff v. A-One*

---

[4] The Court therefore does not address whether a request for medical monitoring damages can be maintained where a plaintiff alleges only harm to property. *See Ivory v. Int'l Bus. Machines Corp.*, 116 A.D.3d 121, 131–32 (3d Dep't 2014) (reading *Caronia* as indicating that "medical monitoring can be recovered as consequential damages associated with a separate tort alleging property damage"); *but see Benoit*, 959 F.3d at 505–08 (discussing *Ivory* and finding it "hardly clear" that *Caronia* "envisioned authorizing an award of medical monitoring to a plaintiff who has no cognizable claim for personal injury but succeeds on a claim for property damage").

*Oil, Inc.*, 216 A.D.2d 291, 292 (2d Dep't 1995) (citations omitted). The "rational basis"

requirement has been "construed to mean the clinically demonstrable presence of [a toxin] in the

plaintiff's body, or some indication of [a toxin]-induced disease (i.e., some physical

manifestation of [toxin] contamination)." *Id.*; *see also Cleary v. Wallace Oil Co., Inc.*, 55 A.D.3d

773, 776 (2d Dep't 2008). For the same reasons the request for medical monitoring survives, the

Court concludes that the request for damages for fear of future physical harm survives as well.

*Supra* Section IV.C.

**V.      CONCLUSION**

       For these reasons, it is hereby

       **ORDERED** that Defendants' motion to dismiss (Dkt. No. 33) is **DENIED**.

       **IT IS SO ORDERED.**

Dated: <u>May 9, 2022</u>
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

21